UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRUCE EDGAR SMITH,<br><br>    Plaintiff,<br><br>  vs.<br><br>SGT. KURTIS BROWN, correctional officer, in his individual and official capacity; JESS BOYSEN, correctional officer, in his individual and official capacity; JUSTIN KUKU, correctional officer; ANGELA STEINEKE, coordinator of West Hall; KEITH DITMENSON, unit manager, West Hall; HEATHER BOWERS, head nurse of health service; MARY CARPENTER, head doctor for health care; LONNA VINK, nurse, health services; and DAVID STEPHAN, Division of Criminal Investigation;<br><br>    Defendants. | 4:16-CV-04014-LLP<br><br><br>ORDER |

Plaintiff, Bruce Edgar Smith, is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls. He filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. Defendants now move for summary judgment before affording Smith the opportunity to conduct discovery. Docket 152. In order to provide Smith the opportunity to conduct discovery, the court holds defendants' motion for summary judgment in abeyance. Nevertheless, the parties are apprised as to the court's thinking on the motion as the record currently stands.

## PROCEDURAL BACKGROUND

On January 25, 2016, Smith filed his initial complaint pursuant to 42 U.S.C. § 1983. Docket 1. The court stayed Smith's case because he had filed the same case in state court. Docket 14. The

court ordered Smith to file notice when the state court case ended. *Id.* On January 5, 2017, Smith

provided documentation showing that the state court proceeding was dismissed. Docket 48-1. But

while Smith's case was stayed, he filed numerous motions to amend his complaint and it was

unclear what now constituted his complaint. The court then ordered Smith to either notify the court

that he wished his proposed amended complaint at Docket 30-1 to constitute his complaint or file

a new amended complaint. Docket 53. On February 3, 2017, Smith filed a letter stating that he

wished Docket 30-1 to constitute his amended complaint. Docket 61 at 3. The court screened

Smith's proposed amended complaint under 28 U.S.C. § 1915A and dismissed the complaint in

part and directed service. Docket 66. The defendants timely filed their answer on May 3, 2017.

Docket 91.

After defendants answered Smith's amended complaint, the court issued a scheduling

order. Docket 92. On May 9, 2017, defendants moved for a protective order to stay discovery

(Docket 96) and Smith opposed (Docket 102). Docket 96. Defendants argued that they were

entitled to qualified immunity and that they should not be subject to discovery until qualified

immunity was determined. Docket 97. On June 21, 2017, the court granted defendants' motion

and stayed discovery. Docket 113. This stay of discovery is still in place. Additionally, the court

ordered that defendants file their motion for summary judgment based on qualified immunity by

July 20, 2017 (Docket 113) and the court later denied defendants' request for an extension (Docket

120). On August 8, 2017, Judge Karen Schreier recused herself (Docket 121) and the case was

reassigned on August 16, 2017. (Docket 128).

On October 16, 2017, defendants moved for summary judgment and, notably, not on the

basis of qualified immunity. Docket 152. After counsel for defendants missed the deadline to file

their motion for summary judgment based on qualified immunity, they should have moved to lift

the stay of discovery, which they had requested, instead of moving for summary judgment on the merits with no discovery. Failing to do so is unfair to both the plaintiff and the Court. They argue that there are no material facts in dispute and defendants are entitled to judgment as a matter of law. Docket 152. Before and after defendants filed their motion for summary judgment, Smith filed numerous motions and supplements raising a variety of issues. Smith moves for entry of default judgment (Dockets 118, 145), leave to file depositions (Docket 123), to amend his complaint (Docket 165), to rescreen his complaint (Dockets 130, 131), to deal with a non-filing of a default judgment and to deal with the discovery issues (Docket 139), to show cause for injunction and a restraining order (Docket 140), to schedule jury trial (Docket 141), and to issue subpoenas (Docket 142). Defendants responded to Smith's motion for default judgment on September 25, 2017. Docket 147. Smith also moves to appoint counsel (Docket 148), for a writ of mandamus with extraordinary remedies (Docket 151), to correct caption (Docket 166), and to supplement all filings in this case (Docket 168). On November 16, 2017, Smith moved for summary judgment (Docket 170) and defendants responded (Docket 172). Finally, Smith moves to bring the case to trial (Dockets 141, 174, 178, 181), to show cause to make changes (Docket 175), and to object to order (Docket 176). For the reasons below, the court denies all of Smith's motions.

## FACTUAL BACKGROUND

Although the court will not rule on the defendants' motion for summary judgment at this juncture, the court recites the facts relevant to the remaining claims in the light most favorable to Smith because defendants move for summary judgment. Where facts relevant to the remaining claims are disputed, both parties' averments are included.

**Boysem, Brown, Kuku**

Smith's first surviving claim includes Smith's allegations that Kurtis Brown, Jess Boysen,

3

and Justin Kuku used excessive force when attempting to subdue Smith on August 18, 2013. Docket 66 at 21-22. According to Smith, "even though [Brown] spaied [sic] me with the entire can [of pepper spray], I just stood their [sic] crying, just looking at him, not moving hardly at all." Docket 1 at 25. Smith alleged that this "just made Sgt. Brown madder then" and "[Brown] order[ed] the other two officers to tackal [sic] me and take me down then." *Id.* It is alleged that the officers "started running at [Smith] hard" and hit Smith "full force driving [him] down the tier about 25 feet." *Id.*

The incident began when Boysen and Brown "responded to an Emergency Call Light at cell 42 in West Hall" of the SDSP. Dockets 163-1, 163-66 at 5-6. When Boysen "arrived cell front," he observed Smith "bleeding profusely from the nose and restraining the wrist of Inmate Pinkal." *Id.* Smith informed Boysen that his cellmate, Pinkal, had "hit him in the face." *Id.* Boysen then "cuffed up Inmate Pinkel and opened the cell door to remove him" so that he could be "escorted to the East holding cell" pending an investigation into the incident.

When Brown arrived at the scene, he "found Inmate Smith standing outside the cell with blood running down his face." Dockets 153-116 ¶ 4, 153-3. Boysen advised Brown that Smith "had been in a fight with his cellmate." Docket 153-116 ¶ 4. Whenever there is an altercation between inmates, the SDSP procedure dictates that all inmates involved are escorted to and placed in the special housing unit (SHU) pending an investigation into the incident. Dockets 153-116 ¶ 7, 153-115 ¶ 5. Thus, Brown informed Smith that he "needed to cuff up because he had been in a fight and had to go to the SHU." Dockets 153-116 ¶ 7, 153-3. Smith claims to have responded by "calmly explaining to Brown that he had not been in a fight with his cellmate but had been attacked by him." Docket 66. Nevertheless, Smith did not to comply with Brown's directive to "cuff up" and Brown "called other officers to the cell." Dockets 153-3, 153-116 ¶ 9.

Kuku responded to the scene after Brown had already given Smith multiple directives to

"cuff up." Dockets 153-3, 153-115 ¶ 6. Smith testified in his criminal trial, *State v. Bruce Edgar Smith,* Minnehaha County Crim. File No. 13-7319, that Kuku also advised him that he was "still going to have to go down to the holding cell" so that they could "talk this out." Docket 153-76 at 6. Smith claims that "Officer Kuku and [Smith] turned and started walking down the tier when Sgt. Kurtis Brown and Officer Jess Boysen was [sic] running down the tier tword [sic] [Kuku and Smith]." Dockets 153-1, 153-3. Smith avers he "told Sgt. Brown that Officer Kuku and I was heading down to the holding cell then [Kuku] was going to take me to Health Services for medical treatment." Docket 1 at 24. Then Smith contends he was sprayed with an entire can of mace and tackled to the ground. Docket 170 at 4.

Defendants aver that Smith was not "heading down to Health Services for medical treatment[.]" Dockets 153-1, 153-3, 153-116 ¶¶ 7-13, 153-115 ¶¶ 7-9. And defendants claim there is no support in the record for Smith's assertions that he was "calmly explaining to Brown that he had not been in a fight" and that, even after being sprayed with mace, he "just stood their [sic] crying, just looking at him [Brown], not moving hardly at all." Smith acknowledges that, according to Brown's report, he "started to square with me [Brown]" and "started to posture as if he was ready to fight." Dockets 1 at 29, 31, 153-3, 153-6, 153-116 ¶ 9.

Furthermore, Brown's account of events is consistent with the testimony Smith gave during his criminal trial. According Smith's previous testimony, he "didn't think it was fair that he had to go to IP or Investigative Purposes." Docket 153-76 at 11. Smith testified that he had therefore made up his mind that he was "going to do anything [he] had to do to stop from having to go out to IP." *Id.* at 12. Smith further stated that he had been "told to cuff up several times" but he "refused every single time." *Id.* at 10-11.

Brown's account of events is consistent with Smith's statement to authorities during an

interview on August 19, 2013. He told authorities that he was "mad at the time and wasn't going to IP" and that "if he was going down to IP, he was going to go down hard." Docket 1-5 at 146. Smith told authorities that "what happened next was his fault." Docket 1-5 at 146. He stated that this whole incident could have been avoided if he had simply "complied with these officers or with Sgt. Brown's directives." Docket 153-76 at 14.

According to defendants, Smith then "started to square off" with Brown. Dockets 153-116 ¶ 9, 153-3. Brown, Boysen, and Kuku tried reasoning with Smith to cuff up. Dockets 153-116 ¶ 10, 153-115 ¶ 7, 153-6. Defendants allege that Smith then "became upset and drew blood into his mouth" which he then spit on Sgt. Brown. Docket 153-116 ¶ 11, 153-3, 153-6. Smith fiercely denies ever spitting on Sgt. Brown. Docket 170 at 6. In fact, Smith was found not guilty, in the criminal trial, of having violated SDCL 22-18-20. Rather, defendants rely on Smith's guilty plea before the Unit Disciplinary Committee (UDC) at the SDSP, of having violated "H-5." Dockets 153-117 ¶ 8, 153-7. That prohibited act precludes an inmate from "throwing or spitting any substance at or upon any non-inmates or intentionally smearing any substance to come into contact with any non-inmate." Docket 153-117 ¶ 4.

After the alleged spitting, Brown "gave him [Smith] one last directive to cuff up." Dockets 153-116 ¶ 12, 153-3, 153-6. According to Boysen and Kuku, Smith "refused to cuff up even after the final warning to be cuffed up or sprayed." Dockets 153-115 ¶ 8, 153-4, 153-5, 153-76 at 10.

Defendants dispute Smith's claim that Boysen "start running at [Smith] hard" and "hit [Smith] full force driving [Smith] down the tier about 25 feet . . . driving [Smith] up over [Smith's] head." Docket 1 at 25. Boysen avers that he was positioned only one cell down from where Smith was standing. Dockets 153-116 ¶ 14, 153-115 ¶ 10. And the officers' accounts are consistent with statements made by Smith in his Complaint which he concedes that the other officers were

standing only "about 5 feet away." Docket 1 at 24. Defendants aver that Smith was restrained in the same spot that he was standing and was not "driven 25-32 feet down the tier. That's 5 cells." Dockets 153-116 ¶ 15, 153-115 ¶ 11. In order for Smith to have been driven over 30 feet down the tier, he would have had to have gone through a door/gate that separates Tier 2 South in half. Dockets 153-116 ¶ 16, 153-115 ¶ 12. It would have been difficult, if not impossible, for Smith to have been driven "over his head" through such a narrow opening.

Following the use of force, Smith claims that he was never decontaminated, suffered a broken nose, and injured his ankle. In an uncontested Informational Report dated August 18, 2013, Nurse Lonna Vink indicated that "nursing staff attempted to perform vitals on Inmate Smith using BP machine but were unsuccessful due to inmate's recent decontamination." Dockets 153-115 ¶ 14, 153-11.

Smith alleges that his nose was "broken in two places" as a result of the force used by the officers. Defendants aver that there is no support in the record for any such assertion. Smith, shortly after the incident in question, was taken to Health Services to be examined. At that time, he told medical staff that he "had been punched in the nose by another individual." Dockets 155 ¶ 7, 153-11. When later examined at Midwest Ear, Nose & Throat (ENT) on September 5, 2013, Smith informed medical staff that he "injured his nose on 8/18/13 during a fist fight with an inmate." Dockets 155 ¶ 56, 153-9. Smith never mentioned officers breaking his nose in their attempt to restrain him. And during the criminal trial of *State v. Smith,* Minnehaha County Crim. File No. 13-7319, when asked "In fact, I think you testified that it was Mr. Pinkal that broke your nose," Inmate Smith testified "Yes." Docket 153-66 at 8. Smith testified, "he [cellmate] broke my nose in two places." Docket 153-76 at 6.

As to his ankle, Smith claims he told Health Services "that my ankle hurt badly and I

couldn't hardly walk." Docket 1 at 8. Yet, records from Health Service show no mention of Smith struggling to walk immediately following the incident. Dockets 153-11, 161 ¶ 8. Smith first reported an injury to his ankle on December 4, 2013, during a chronic care visit. There, Smith complained that "since this incident he has been having increased left ankle pain." Docket 154 ¶¶ 9-12. Defendants aver that Smith is feigning symptoms, because Smith displayed no limp or distress when he came to the clinic. Dockets 153-25, 154 ¶ 28.

**Vink**

Smith's Eighth Amendment claim against Lonna Vink, in connection with the medical care that was afforded Smith following the above-referenced incident, also survived screening. Docket 66 at 16-17. Smith alleges that Vink was "the nurse in charge that night I was brought to Health Services after I had been mased [sic] and assaulted by the officers" and she "said that there was nothing [sic] wroung [sic] with me, so she sent me to the SHU, without any treatment for my injuries." Docket 59 at 2.

Vink alleges that she was not the person who "sent [Smith] to the SHU without any treatment." Dockets 161 ¶ 6, 153-95. Vink only "walked into the room while the assessment was being conducted and assisted therewith due to the agitated state that Smith appeared to be in." Docket 161 ¶ 7. Vink further alleges that, at the time in question, Smith's injuries did not appear to be serious. As reflected in the Informational Report dated August 18, 2013, Smith was "experiencing a bloody nose" and "a small cut was noted on the bridge of his nose." Dockets 161 ¶ 8, 153-11. This report is consistent with that in the "Segregation Admission Check List." Dockets 161 ¶ 9, 153-95. As indicated in the "Check List," Smith had a "1.5 cm laceration on the bridge of his nose" and a "small amount of bleeding" was noted. The "Check List" noted that Smith's nose was said to be "somewhat deviated to the right." Dockets 161 ¶ 10, 153-95. Smith,

in his Complaint, readily acknowledges that Health Services "sent me to the SHU without knowing that my nose was broken." Docket 1 at 18.

Defendants aver that there was no reason for Health Services to believe that Smith had sustained an injury ankle. There was no mention whatsoever by Smith that he "couldn't hardly walk." Docket 161 ¶ 11. The record reflects that the first time that Smith complained of any injury to his ankle was not until December 4, 2013. Dockets 155 ¶ 9, 153-12. And the aforementioned "Check List" further reflects that there were no "contra indications to segregation" nor were any "accommodations required." Dockets 161 ¶ 12, 153-95. Smith's condition was said to be "stable" when he was taken to the SHU. Dockets 161 ¶ 12, 153-11.

**Ditmenson**

Smith's Eighth Amendment claim against Keith Ditmenson, in connection with the medical care that was afforded Smith following the above-referenced incident, also survived screening. Docket 66 at 16-17. Smith alleges that Ditmenson violated his rights when he "tried to go to sick call but was turned down, and every day after that was turned down." Docket 1 at 8.

Defendants aver that Ditmenson never ignored Smith's sick calls for the five days after the incident. Docket 159 ¶ 6. If any inmate, while housed at the SHU at the SDSP, believes that he is in need of medical attention, he need only submit a Kite to unit staff requesting to be seen by Health Services. Docket 159 ¶ 7. That Kite is then simply forwarded to Health Services and arrangements are thereafter made for the inmate to be examined by medical staff.

Defendants aver that if Smith had submitted a Kite or Sick Call Request asking to be seen by Health Services, arrangements would have been made, pursuant to SDDOC Policy 1.3.A.7, Transport and Escort of Inmates, for him to have been seen by Health Services. Docket 159 ¶ 8. Pursuant to said policy, staff may initiate the request to transport the inmate off the unit for

"medical reasons."

Additionally, Health Service nurses visit the SHU at least four times per day in order to conduct med pass and distribute prescribed medications. Docket 158 ¶ 12. Smith, therefore, would have had ample opportunity to speak with a nurse and submit a Request for Sick Call. But Smith alleges that he did ask nurses but they did not help him. Docket 170 at 7. Finally, Smith stated that he "got up to see the medication nurse" on the night of August 27, 2013, and she "told me that she would see to it that I would be brought up for sick call today, and she did so." Docket 170 at 8.

Defendants' review of Smith's medical records shows that Smith did not submit a Sick Call Request until August 23, 2013. Docket 159 ¶ 13. The Sick Call was reviewed by Dr. Regier on August 27, 2013 and he ordered nasal bone and facial bone x-rays. Docket 159 ¶ 14. Those x-rays were completed on August 28, 2013. Smith was seen by Dr. Regier on August 29, 2013, but Health Services was unable to pull those [x-rays] up on the computer due to an apparent technical problem. Dockets 159 ¶ 9, 153-10.

**Dr. Carpenter - Nasal Injury**

The court also found that the Eighth Amendment claim against Dr. Mary Carpenter, in connection with the medical care that was afforded Smith following the above-referenced incident, also survived screening. Docket 66 at 16-17. A review of Inmate Smith's medical records reveals that Smith, on August 28, 2013, underwent a series of x-rays on his facial bones. Those tests were "negative for orbital fractures" and the orbits were said to "appear normal." Dockets 154 ¶ 54, 153-39. Smith alleges that Dr. Regier said that the technician incorrectly read these results. Docket 170 at 8. Nevertheless, there was a "suspicion of a minimally displaced fracture of the nasal bridge." An Authorization Request was thereafter submitted on August 29, 2013 for an "ENT consult ASAP." That request was approved on the same date. Dockets 154 ¶¶ 55-56, 153-40, 153-

49.

Smith was seen at Midwest ENT in Sioux Falls, South Dakota on September 5, 2013. Docket 1 at 11. Smith's nasal bridge "appears deviated to the right" and his septum was said to be "significantly deviated to his right side." Dockets 154 ¶¶ 55-56, 153-9. According to the report, "No significant tenderness noted." But Smith alleges that "the first time that I was their [sic] [ENT], they was going to rebrake [sic] my nose and reset it . . . but it was turned down by the Health Services medical, they wanted to think about it and resend me back another day." Dockets 1 at 11, 170 at 8. Defendants contend that a review of the report received from Midwest ENT, dated September 5, 2013, contains no mention whatsoever of "going to re-break [Smith's] nose and reset it." Dockets 154 ¶ 73, 153-9.

Smith alleges that he "had to have surgery because of this delay." Defendants aver that there is absolutely no support whatsoever in the record for Smith's assertion that Dr. Todd, Midwest ENT, "feels it [surgery] is a medical emergency." Dockets 154 ¶ 72, 153-9, 153-41. The Midwest ENT reports stated that medical personnel "does not feel it is a medical emergency." Dockets 154 ¶ 72, 153-9. "Documentation was sent back to the penitentiary stating that this is not a medical emergency." Dockets 154 ¶ 72, 153-9. It was the opinion of Dr. Todd, after examining Smith, that this was a "non-emergent condition." Dockets 154 ¶ 72, 153-41. Subsequent thereto, an Authorization Request was submitted by Dr. Regier on September 25, 2013, for Smith to undergo a "nasal bone fracture/reduction." That request, however, was denied on September 25, 2013. As indicated therein, "ENT physician states emergency treatment not needed." Dockets 154 ¶ 74, 153-42.

Smith was again later seen at Midwest ENT on December 20, 2013. He was again diagnosed with a deviated septum. Dockets 155 ¶ 76, 153-44. Staff at Midwest ENT indicated

that Smith was "most likely a candidate for surgical intervention" and indicated in their report that "our office will contact the prison regarding the matter for following up." A "Physician Order" was issued by Midwest ENT on January 7, 2014, informing Health Services at the SDSP that "we need an appointment made for Bruce [Plaintiff] to see Marc Ellwein, PA-C, at clinic when Dr. Todd is here to discuss surgical options." Dockets 154 ¶ 77, 153-45. An Authorization Request was thus submitted on January 10, 2014, for a consult at Midwest ENT. Dockets 154 ¶ 77, 153-46. That request was approved on that same date.

When seen at Midwest ENT on January 27, 2014, Smith "states there has been no change in his symptoms." Dockets 154 ¶ 78, 153-47. A physical examination was conducted and showed "the fracture is unchanged." *Id.* It was recommended "proceeding with a septoplasty, turbinate reduction, and a concha bullosa excision as well as a ORIS nasal bone fx reduction." Dockets 154 ¶ 79, 153-47. An Authorization Request was thereafter submitted by Dr. Regier on January 31, 2014 for "nasal surgery." That request was later denied, because Smith's nasal issues were said to be a "chronic condition—not emergent." Dockets 154 ¶ 80-81, 153-48. Dr. Carpenter believed that there was simply no current need for surgical intervention. Docket 154 ¶ 80. Nothing in the report from Midwest ENT suggested that Smith's nasal condition had deteriorated so as to require surgical intervention. Dockets 154 ¶ 80, 153-47.

Defendants aver that there is nothing in Smith's medical records which would suggest that his condition was exacerbated by any delay in undergoing nasal surgery. Docket 154 ¶ 81. Smith has, since February 2014, been seen by Health Services at the SDSP on numerous occasions. Smith has not raised any complaints to medical staff regarding his nose. Dockets 154 ¶ 82, 153-21, 153-22, 153-23, 153-24, 153-51, 153-52, 153-53, 153-54, 153-55, 153-56, 153-57, 153-58, 153-59, 153-60, 153-61, 153-62, 153-63. Smith has submitted various Kite Request Slips asking

to be seen by Health Services, but none of those "kites" mention anything about him experiencing any difficulty breathing through his nose. Docket 154 ¶ 83.

While Smith was seen by Health Services on February 7, 2015, complaining of shortness of breath, the record reflects that his "O2 saturation level was 93-98% on room air." Dockets 154 ¶ 84, 153-24. Those saturation levels were said to be more than adequate since levels above 90% are considered satisfactory. Docket 154 ¶ 85. Defendants aver that Smith's shortness of breath complaint is unlikely due to his deviated septum. While a person may feel congested as a result of a deviated septum, they do not typically experience shortness of breath as a result thereof. Docket 154 ¶ 85. As a result, Health Services "encouraged deep breathing exercises" for Smith. Dockets 154 ¶ 86, 153-24. The "deep breathing exercises" recommended by medical staff are indicative of an anxiety/panic attack consistent with Inmate Smith's psychiatric history. Docket 154 ¶ 86.

When seen by Health Services on September 13, 2016, Smith complained that he was "unable to breathe from right side of nose due to fracture and sinus congestion." Dockets 154 ¶ 87, 153-84. When examined, Smith was again diagnosed with "sinus congestion." Smith, therefore, "reports that he would like a medication for his ongoing sinus issues." Dockets 154 ¶ 87, 153-94.

When seen for a "routine physical exam" on January 10, 2017, Smith was asked by Health Services "if he had any further medical concerns." Dockets 154 ¶ 88, 153-92. In a response thereto, Smith instructed medical staff "don't ask me that question." A review of the medical entry on the above date reflects that Smith "offers no further medical concerns at this time." Dockets 154 ¶ 88, 153-92.

When seen by Health Services on April 7, 2017, Smith was "argumentative and continually

brings up lawsuit." Dockets 154 ¶ 89, 153-93. He advised Health Services that "I don't want to do this. We can do this in court."

**Dr. Carpenter - Ankle Injury**

The court also found that the Eighth Amendment claim against Dr. Mary Carpenter, in connection with the medical care that was afforded Smith following the above-referenced incident, also survived screening. Docket 66 at 16-17. Smith asserts that, when seen by Health Services on August 26, 2013, he told medical staff that "my left ankle hurt badly and I couldn't hardly walk." Docket 1 at 8. But the Informational Report prepared by Vink on August 18, 2013, there was no mention therein of Smith being unable to "hardly walk." Dockets 161 ¶11, 153-11. And the "Segregation Admission Check List" prepared by Health Services on August 18, 2013, does not mention that Smith "couldn't hardly walk." Dockets 161 ¶ 11, 153-95.

Although unsupported by defendants' records, Smith claims that he told the "medication nurse" on the "night of the 22nd day of August, 2013" that he could "hardly walk." Docket 1 at 9. Records do reflect that, on August 23, 2013, Smith put in a Nurse Sick Call to "discuss medical orders" but it "was not specific to an injury." Docket 158 ¶ 6. Smith alleges that "Nurse Lesa," on the afternoon of August 22, 2013, "looked at [Smith's] left ankle" and "order x-rays the next day to be taken of [Smith's] ankle." Docket 158 ¶ 7. Defendants aver Smith's medical records do not support this assertion.

Smith was seen for a "Nurse Sick Call" on August 26, 2013, but it was in connection with complaints of an injury to his nose. Docket 158 ¶ 8. On August 27, 2013, Dr. Regier reviewed the Nurse Sick Call and ordered nasal bone and facial bone x-rays. Docket 158 ¶ 8. These x-rays were completed on August 28, 2013. Dockets 158 ¶ 9, 153-20. When again seen by Health Services at the SDSP on August 29, 2013, Smith was said to be "ambulatory." Dockets 154 ¶ 7, 153-10. Smith did not mention having problems or difficulty with his left ankle.

14

Defendants allege that the first time Smith complained of any problem with regards to his left ankle was on or about December 4, 2013, when seen by Health Services for a "Chronic Care Visit." At that time, he "reports since this incident [8/18/13] he has been having increased ankle pain." Dockets 154 ¶ 9, 153-12. Smith complained that he "has crepitus in his ankle" and indicated that he "feels like it is broken." Dockets 154 ¶ 10, 153-12. Smith, however, "denies specific ankle instability" and was said by medical staff to be "more commenting on the fact that he has crepitus." A physical examination revealed that "No noted swelling or ecchymosis [bruising] is seen around the left ankle" and "No point tenderness is noted." Dockets 154 ¶ 11, 153-12. The medical records reflect that "No joint laxity in the left ankle is noted." Health Services elected to "additionally order a left ankle x-ray as well as a left ankle sleeve x 1 year." Dockets 154 ¶ 12, 153-12. Arrangements were made whereby Smith underwent said x-rays on or about December 5, 2013.

The results of the x-rays taken of Smith's ankle revealed that there was a "nondisplaced, sagitally-oriented fracture involving the base of the medial malleolus." Dockets 154 ¶ 13, 153-13. There was, however, "No evidence for a distal fibular fracture" and "No posterior malleolus fracture." According to the report, "No other fractures are identified." Dockets 154 ¶ 13, 153-13. Subsequent thereto, arrangements were made whereby Inmate Smith was examined at Core Orthopedics in Sioux Falls, South Dakota, on or about December 18, 2013. When seen on that date, Smith reported "No specific instability episodes." Dockets 154 ¶ 14, 153-14.

Upon physically examining Smith's ankle, Dr. David Watts noted "No obvious instability on inversion and anterior drawer stressing." Dockets 154 ¶ 15, 153-14. Smith was said to have "Full ankle hindfoot range of motion." Smith was diagnosed with a "left ankle sprain." Dockets 154 ¶ 16, 153-15. It was nonetheless recommended that Smith undergo "MRI of left ankle to evaluate for OCD/fracture." On January 21, 2014, Smith underwent an MRI which revealed "No

acute fractures at the site of focal tenderness." Dockets 154 ¶ 17, 153-16. He was again diagnosed with what was said to be a "Type 1 ligamentous sprain."

Smith was examined again at Core Orthopedics on January 29, 2014. Unlike his previous examinations, Smith was said to have "obvious instability with inversion stressing compared to the opposite side." Dockets 154 ¶ 18, 153-17. According to the report, the MRI demonstrates an area along the lateral cartilage with a chondral defect. *Id.* Although Smith was diagnosed with "Cartilage loss at the lateral aspect of the talar dome," the record reflects that said "cartilage loss at the lateral aspect of the talar dome likely related to degenerative arthritis." Dockets 154 ¶ 20, 153-16. At that time, it was recommended that Smith undergo a scope of his left ankle and that he be "scheduled for a modified Brostrom." Dockets 154 ¶ 21, 153-17, 153-18. An Authorization Request was thus submitted on February 4, 2014 for Smith to undergo left ankle surgery. Dockets 154 ¶ 21, 153-19.

In response thereto, Dr. Mary Carpenter contacted Core Orthopedics and "engaged in a discussion with Orthopod who stated that not fixing the ankle instability immediately would not change the long term outcome." Docket 154 ¶ 22. The Authorization Request for left ankle surgery was thus denied since it was a "chronic condition—nonemergent." Dockets 154 ¶ 23, 153-19. In lieu of surgery, the decision was made to pursue, for the time being, a more conservative course of treatment. Smith was provided with a "lace up ankle brace." Dockets 154 ¶ 24, 153-21. Smith was informed that he "must wear brace as a conservative measure at this time" and that Health Services "will monitor patient." Dockets 154 ¶ 25, 153-21.

Smith when seen by Health Services on June 4, 2014, for another Chronic Care Visit, was "currently in a lace up ankle brace which patient does report helps with his ankle stability." Dockets 154 ¶ 26, 153-25. Smith was "additionally requesting to use a cane to better help his balance due to his ankle instability." Health Services thus elected to "order a cane use x 1 year."

16

Dockets 154 ¶ 27, 153-25.

Defendants allege that Smith may have been feigning his symptoms with regard to the alleged instability in his left ankle. Smith denies ever feigning symptoms. Docket 170 at 9. When leaving Health Services on June 4, 2014, Smith was "noted to ambulate out of the room with a left sided limp." Dockets 154 ¶ 28, 153-25. But the record reflects that "of note is that nursing evaluated patient's gait when he came to clinic and was not noted to have a limp or be in any distress." Dockets 154 ¶ 28, 153-25. Smith's medical records also contain a notation, dated June 4, 2014, that when "patient arrived at clinic for CCC appointment," nursing staff "observed gait. Patient gait steady and no limp noted." Dockets 155 ¶ 29, 153-21. According to nursing staff, "patient does not appear to be in any pain or distress." The record reflects that "patient continues to use stairs to go to chapel and Health Services without difficulty." Dockets 154 ¶ 37, 153-21. It was "verified with the Health Services officer" that Smith also "accesses Health Services via stairs and has not requested an escort to/from Health Services on the elevator." Smith, when seen by Health Services on August 27, 2014, was again said to "ambulate in the room with a normal gait and without difficulty." Dockets 154 ¶ 30, 153-26. Defendants allege that Smith, despite having asked for and received a "no stair medical order" from Health Services, was observed on September 11, 2014 "delivering commissary on Tier 4." Dockets 154 ¶ 39, 153-23.

When seen, however, by Health Services on December 3, 2014, Smith complained that he was "attempting to continue with daily activities but is having increasing difficulty regarding his left ankle." Dockets 154 ¶ 40, Docket 153-29. According to Smith, he "continues to have some instability without extra support items such as a cane" and allegedly "recently started using a wheelchair for long distances." *Id.* In response to Smith's complaints, Health Services elected to "resubmit a request for patient's left ankle surgery." Dockets 154 ¶ 41, 153-29. An Authorization Request was thus submitted on December 4, 2014 for "left ankle surgery." Dockets 154 ¶ 41,

153-30. That request was approved by the Medical Director on December 5, 2014. Dockets 154 ¶ 42, 153-30. Smith was therefore seen at Core Orthopedics on December 23, 2014 in regards to "other treatment options." Dockets 154 ¶ 42, 153-31.

Upon evaluation, Smith was said to have "obvious instability with stressing of the ankle comparatively to his opposite side." The recommendation was to plan on doing an ankle scope and possible microfracture of an OCD lesion, as well as a Brostom's repair." Dockets 154 ¶ 43, 153-27, 153-28. Smith thereafter underwent a "pre op physical" on or about January 26, 2015. Dockets 154 ¶ 44, 153-34, 153-55. The surgical procedure itself was performed on February 4, 2015. Dockets 154 ¶ 45, 153-35. Smith's ankle, following said procedure, was said to have "full range of motion with no further instability noted."

Smith was specifically instructed to be "nonweight bearing for a period of 6 weeks." Dockets 154 ¶ 46, 153-35. When seen for a "follow up" at Core Orthopedics on February 18, 2015, Smith was "placed in a short leg cast" and was again instructed to "remain strict non-weight bearing." Dockets 154 ¶ 46, 153-36. Smith, however, elected not to follow those directives and admitted to Health Services on February 14, 2015 that he had been "putting weight on left lower extremity." Dockets 154 ¶ 47, 153-24. He was again "educated that he is non-weight bearing to his left lower extremity."

When seen at Core Orthopedics on May 1, 2015, a physical examination of Smith's left ankle revealed "No obvious instability." Dockets 154 ¶ 49, 153-38. The various x-rays taken of the ankle were said to be "normal." When later seen at CORE Orthopedics on July 1, 2015, Smith, for the very first time, complained that "he's been falling quite a bit because his ankle has been giving out and he feels that he needs ankle support." Dockets 154 ¶ 51, 153-79. In response thereto, Dr. Watts, CORE Orthopedics, indicated that "we will write him an order for a workers

boot" and "try the boots for a few months and follow him back in two months to see how he is doing."

Smith, when seen at CORE Orthopedics on September 1, 2015, complained that "the ankle still does give away when he is not wearing a cam boot." Dockets 154 ¶ 52, 153-80, 153-81. It was therefore recommended that Smith undergo a "procedure to possibly try to stabilize this [ankle] again." On October 19, 2015, Smith was seen by Health Services at the SDSP for a "pre-operative physical prior to left ankle revision surgery." Dockets 154 ¶ 53, 153-84. As indicated therein, "patient has stopped all of his medications as of 9/15/2015 due to one of the nursing staff making him mad." The incident on September 15, 2015, as will be shown elsewhere herein, involved the issuance of the work boots that had been recommended for Smith.

The record reflects that Smith, on October 27, 2015, underwent a "Watson Jones procedure left ankle transfer of the peroneus brevis tendon to the fibula and lateral talus." Dockets 154 ¶ 55, 153-85, 153-86. As reflected in the hospital report, the "modified Brostrom's [procedure]" that Smith previously underwent in February 2015 was said to be unsuccessful due to the tissue having been "significantly atrophied at that point." Dockets 154 ¶ 55, 153-85. There is nothing, however, to indicate, from a medical standpoint, that the "modified Brostom's" procedure was unsuccessful as a result of any delay in performing surgery on Smith's left ankle. Docket 154 ¶ 56. As indicated elsewhere herein, although Smith was said to have "very little tissue for repair at the time of his ATFL" the ligament/cartilage loss diagnosed with regards to his left ankle was "likely related to degenerative arthritis." Dockets 154 ¶ 56, 153-16.

Smith was, on December 8, 2015, seen at CORE Orthopedics for a post-operative examination. His ankle, upon examination, was said to be "stable to inversion testing." Dockets 154 ¶ 57, 153-86. Smith was instructed that he could "begin progressive weight bearing as

19

tolerated through a cam boot for the next two weeks."

When later seen at CORE Orthopedics on January 19, 2016, Smith had "progressed into full weight bearing in a regular shoe and presents today in his regular shoe." Dockets 154 ¶ 58, 153-78. Smith "denies any instability" and other than "continued numbness lateral dorsal foot," reported that he is "doing well." The evaluation of Smith's ankle again revealed "no instability with inversion stressing." Dockets 154 ¶ 59, 153-88. The report received from CORE Orthopedics revealed that there were "no restrictions on this left ankle" and Smith was thus said to be "able to do stairs at this point."

Smith was seen by Health Services at the SDSP on March 7, 2016, with continued complaints of "continued left ankle pain." Dockets 154 ¶ 60, 153-89. Smith, however, "reports he is okay with results from surgeries." According to Smith, "conversations with him and Dr. Watts, this is what was expected." Smith, in a letter to Dr. Watts, indicated that he had "dumped the wheelchair, I started walking again." Dockets 154 ¶ 61, 153-90. According to Smith, he also "started working, the stairs, and not using the elevator." A review of said letter reveals that Smith also stated that "My tendon feels really good." Dockets 154 ¶ 62, 153-90. According to the letter, there was "no sideways giving." Smith closed the letter to Dr. Watts by stating "Nice, really nice."

Smith, when later seen by Health Services on July 7, 2016, maintained that "Dr. Watts recommended physical therapy to him in person," but that "patient stated that he (Smith) did not think it was worth the time." Dockets 154 ¶ 63, 153-91. Nursing staff undertook to review Smith's file but did "not find any documentation at this time of recommendations for physical therapy in external documents." Health Services, in response to complaints of pain in his left ankle, "offered patient Meloxicam or Sulindac for his pain." Smith, however, "declines stating he does not like

taking pain medications." Dockets 154 ¶ 64, 153-91. According to Smith, he "can handle pain and does not want pain medication."

As already indicated elsewhere herein, Smith, when seen by Health Services at the SDSP for a "routine physical exam" on January 10, 2017, was asked if he "had any further medical concerns." Dockets 154 ¶ 65, 153-92. In response thereto, Smith instructed medical staff "don't ask me that question." Smith displayed similar behavior when later seen by Health Services on April 7, 2017. The record reflects that Smith was said to be "argumentative" and informed the charge nurse that "I don't want to do this. We can do this in court." Dockets 154 ¶ 66, 153-93.

## Dr. Carpenter - Seroquel[1]

The court also found that the Eighth Amendment claim against Dr. Mary Carpenter, in connection with taking Smith off of Seroquel, also survived screening. Docket 66 at 16-17. Smith claims his bipolar disorder was left "untreated." Smith alleges that Dr. Carpenter "is again the reason why I was taken off the medication Seroquel" and that she "made a decision to stop the Seroquel because the price had gone up and she didn't want to pay for this." Dockets 1 at 43-44. Defendants contend that Dr. Carpenter had nothing to do with the decision to discontinue the Seroquel. Mental Health medications are managed solely by Mental Health Services at the SDSP. Docket 155 ¶ 91.

Lynette Melby, CNP, on or about December 31, 2014, submitted an Authorization Request to "continue Seroquel XR 300 mg orally at supper," but that request was denied by the Mental Health Director on January 1, 2015. Docket 164-9 at 7. As reflected in Smith's medical records, the request to continue the Seroquel was denied because "need documented trials of formulary

---

[1] In this section, defendants cite the affidavit of Lynette Melby, CNP, in their statement of undisputed material fact. Defendants failed to file any such affidavit. Thus, the court does not review nor rely upon defendants' citations to such affidavit.

alternatives for continued use." Docket 164-9.

Although Smith "had been on Seroquel many years," Mental Health staff undertook to inform Smith, on several occasions, that Seroquel was "not approved for him here because it is not in our formulary." Docket 164-9. Mental Health staff, on repeated occasions, attempted to "discuss several other mood stabilizers for Smith." Docket 164-9 at 12. According to his mental health records, Smith was "steadfast that [Seroquel] is the only mood stabilizer that has helped him." *Id.* Mental Health staff attempted to "discuss several other mood stabilizers" with Smith but he "stated that he did not want to be a Ginny pig." *Id.*

Mental Health staff attempted to substitute Abilify in place of the Seroquel. Smith, however, "stopped taking his Abilify because he has developed a hand tremor" and he "ties this into when he began the Abilify." Docket 164-10. As indicated, however, in his Mental Health records, "at the same time, he told Health Services that he had been diagnosed with Parkinson's." According to Mental Health staff, it was "very difficult to discern what is actually happening with him." *Id.* A request, therefore, was "made through Health Services for him to see a neurologist for a consult." Docket 164-9 at 8.

When seen by Mental Health in July of 2016, Smith "declined to be on any antidepressants or psychotropic medications." As reflected in his mental health records, Smith was simply "unwilling to try other medications." *Id.* at 12. When Mental Health staff attempted to explain to Smith that "he is the one who got to decide whether he wants to take a medication or go without," he stated "Don't push me or I'll leave." Smith, when told that "it was fine either way," got up and left. *Id.*

Smith, when later seen by Mental Health on January 20, 2017, indicated that he was "skeptical of starting new medications." Docket 164-10 at 3. According to Smith, he was "not

22

sure if he should be on medications with his impending lawsuit." *Id.* Smith, in his Amended Complaint, readily admits that it was his decision to have "stopped all my medications." Docket 1 at 44. Smith claims he "started having severe mood swings right away and they came back in a vengeance." *Id.*

Smith, in a Kite to Mental Health, on or about January 25, 2015, stated "I am not going crazy, that's good." Docket 164-10 at 11. Smith was seen by Mental Health on March 6, 2015, and Smith was "certainly good natured." Docket 164-9 at 8. Staff, therefore, were "unable to relay how this affects him other than his mood swings being all over the place." *Id.* At 9. Mental Health staff "tried to explain that it is not necessarily a bipolar disorder" and that "we all have days where we are in better moods than others." *Id.* Smith was seen on a continuing basis by Mental Health staff and his thoughts continued to be "logical and goal oriented." There were "no psychotic indices endorsed or noted." *Id.* According to his Mental Health records, Smith "appears to be doing really well." Docket 164-9 at 11. Smith himself acknowledged in his pleadings that his bipolar disorder has "balanced out" and there are "moderate highs, hardly any lows anymore." Docket 1 at 45.

Smith did agree to "start a trial of Depakote ER 500 mg every evening to help his mood stabilize and anxiety." Docket 164-10. When later seen by Mental Health staff on March 9, 2017, Smith indicated that the Depakote had "helped to make his mood more stable." Docket 164-10 at 8. According to Smith, "his cellmate has noticed the improvement in his mood, and that means a lot." *Id.*

**Bowers & Steineke – Work Boots**

The court also found that the Eighth Amendment claim against Angela Steineke and Heather Bowers, in connection with the medical care that was afforded Smith following the above-

referenced incident, also survived screening. Docket 66 at 16-17. Smith alleges that he "got no boots even though they were a medical order issued." Dockets 1-1 at 58, 156 ¶ 7, 153-78, 153-83, 153-99. Smith alleges that he received his boots on December 29, 2015. Docket 170 at 12. The record reflects that CORE Orthopedics, in the report dated July 1, 2015, indicated that they "will write him [Smith] an order for a workers boot and he will continue to wearing the cam boot for longer distances." Dockets 156 ¶ 7, 153-79. In response, Defendant Bowers, on or about July 9, 2015, undertook to inform prison staff that "the orthopedic doctor recommended that patient wear a work boot on his left ankle for extra support." Dockets 156 ¶ 14, 153-99. Bowers asked prison staff "Is this allowed?" Bowers was advised by prison staff, on July 9, 2015, that "I guess we get him a pair of boots." Dockets 156 ¶ 15, 153-99. She was further informed that prison staff would "order him a pair on Monday," but "they will not issue new till Pibal returns from vacation."

Smith, when later seen by Health Services on September 15, 2015, complained that he "has not received his work boots as recommended by CORE Orthopedics." Dockets 156 ¶ 19, 153-83. In response to Smith's complaint, RN Bowers contacted "UC Steineke who verified that patient received a new pair of shoes and work boots 7/13/15." Dockets 156 ¶ 19, 153-78, 153-83. Smith claims that RN Bowers "told him that she didn't believe that I should have these boots" and that it "took six months to get the boots." Docket 156 ¶¶ 7-20, Dockets 153-78, 153-83, 153-99. Then Smith "became very angry and stated that he wanted to refuse all of his medications." Docket 156 ¶ 20, 153-83. Although nursing staff undertook to "educate patient on the importance of continuing chronic care meds," Smith "requested to sign a Refusal" and a "ROR signed for medications."

**Steineke - Legal Mail[2]**

The court further found that Smith "states a First Amendment claim that his legal mail was opened outside of his presence." Docket 66. Smith alleges that Steineke "likes to scan and read as much [outgoing legal mail] as she can." Docket 1 at 47. According to Smith, Steineke is censoring his mail rather than looking for contraband. Docket 170 at 2. He also contends that he "found out in the mail office that this letter that I had mailed out the clerk had never been mailed out at all." Docket 1-1 at 48. Smith alleges that he gave Steineke a motion to mail to the court, but it was never sent. *Id.*

As indicated by Smith in his Complaint, "the rules and policys [sic] state before these legal mail is to be closed and sealed, that the coordinator is to check for contraband." Docket 1-1 at 47. The "rules and policies" referred to by Smith as set out as SDDOC Policy 1.5.D.3, Inmate Correspondence.

The only incident where Steineke is alleged to have interfered with Smith's legal mail supposedly took place in June 2015. According to Smith's Complaint, "last June 2015, I sent out a motion to the clerk of courts to be filed with the court." Docket 1-1 at 48. The "mail office" at the SDSP, despite Smith's assertions to the contrary, would not have told Smith that they "never received or processed any such letter to the clerk anywhere around that date whatsoever." The standard practice followed at the SDSP is that the mail logs maintained in connection with outgoing legal correspondence are "for SDDOC use only and are not intended for an inmate/offender to gain any information therefrom." Docket 160 ¶ 4.

A review of the Legal Mail Log maintained at the SDSP reflects that Smith, during the

---

[2] In this section, defendants cite the affidavit of defendant Angela Steineke, in their statement of undisputed material fact. Defendants failed to file any such affidavit. Thus, the court does not review nor rely upon defendants' citations to such affidavit.

period of June 15 - 21, 2015, had two items of correspondence delivered to the mail room at the SDSP. Docket 160 ¶ 5, 153-121. The mail log indicated that one letter was addressed to the Clerk of Courts and the other letter was addressed to the Attorney General's Office. Both letters were mailed on June 17, 2015. Docket 160 ¶ 5.

The Legal Mail Log further reflects that, during the period of June 29 - July 3, 2015, Smith delivered an additional two items of correspondence to the mail room for mailing. Dockets 160 ¶ 6, 153-112. Both envelopes were addressed to the Clerk of Courts. Said items were delivered to UC Steineke on June 29, 2015 and were later received in the mail room on June 30, 2015. Dockets 160 ¶ 6, 153-112.

**Retaliation[3]**

The court found that Smith also stated "a claim of retaliation." Docket 66. Smith alleged that "the legal aid hear [sic] at the prison, Mark Bidne, has been placed under severe pressure from prison officials." Docket 30-1. According to Smith, "prison officials are 'putting him [Bidne] through hell' " and he is therefore "not making sure I get over to our appointments." *Id.* Smith contends that prison officials are "pressuring Mark Bidne, paralegal at the SDSP, to keep him from helping Smith" and will not allow Smith to visit Bidne. Docket 30-1, p. 1468.

The record reflects that Smith frequents/visits Bidne's office quite often. According to Bidne, Smith typically signs up and is called over to his office approximately three times a week. Dockets 154 ¶ 6, 153-119. Bidne estimates that, in the three months since the allegations raised in his Complaint, Smith has been to his office on at least twenty-seven different occasions. Dockets 154 ¶ 5, 153-119.

---

[3] In this section, defendants cite the affidavit of Unit Manager Jessica Cook, in their statement of undisputed material fact. Defendants failed to file any such affidavit. Thus, the court does not review nor rely upon defendants' citations to such affidavit.

Smith alleges that defendants are "blocking [Smith] from getting the passes" to see Bidne. But, Smith was allowed to see Bidne on June 13, 2016 when he "took over the originals had one copy made of them all." Docket 30-1 at 1468. Smith was also allowed to see Bidne when "he [Bidne] brought these [copies] to me then the next day." Docket 30-1 at 1469. Bidne was not able to recall any incident where he "called the POD in West Hall to have [Smith] sent over" but prison officials "don't give Smith the pass." Dockets 154 ¶ 6, 153-119.

Smith asserts that "all these copies that I had taken over to the legal office to Bidne's office has gone what you mite [sic] say missing. Hell, they got taken." Dockets 30-1 at 1469. Smith, alleging that "because there was such a large amount of them I had to leave them with him [Bidne]" admits that he "he [Bidne] brought these to me the next day." Dockets 30-1 at 1469. Bidne, in his emails, states that he simply "forgot about it." Dockets 154 ¶ 8, 153-120. According to Bidne, said papers "may have been shuffled around and some paperwork may have been placed on it." Defendants contend that the paperwork that Smith alleges "went missing" was "eventually found in [Bidne's] office located under some other paperwork." Dockets 154 ¶ 8-9, 153-120. Bidne has not had any problems in the past where paper/material from his office have gone missing. Dockets 154 ¶ 9, 153-120, 153-121. Defendants allege that Smith failed, pursuant to the Administrative Remedy Process for Inmates, to file any grievance in connection with the alleged "missing" paperwork. Docket 162 ¶ 7-8.

Smith raises similar allegations in connection with Unit Manager Jessica Cook. According to Smith, he "trusted her" and "gave her all the papers that I had proving that this happened to me." Docket 1-1 at 72. He alleges that "somehow all the papers that I had given her turned up lost."

**Stephan**

The court found that Smith stated a Fourth Amendment due process clause claim against David Stephan. Docket 66 at 12-13. This claim was based on the allegation that Stephan intentionally or recklessly failed to investigate the alleged slimming. Smith contends that Stephan was "brought in to investigate this H-5 Slimming write up that had been written up by Sgt. Kurtis Brown on 8-18-13." Docket 59. According to Smith, Stephan met with Special Security Agent Lt. John Shyne from the SDSP and that "these two officers totally investigated this crime" and "they all created this so-called synopsis that they took to the Attorney General's office . . . to abtain [sic] a[n] Indictment for these charges, to be brought against me." Docket 59 at 1912.

In his Investigative Report, dated August 21, 2013, Stephan was contacted on August 19, 2013 and asked to contact Shyne, with Special Security at the SDSP, to investigate an alleged slimming incident at the SDSP. When contacted by Stephan, Shyne "advised that he had shirt that belonged to Sgt. Kurtis Brown that had blood on it." Docket 1-5 at 144. In the course of his investigation, Stephan interviewed Brown. According to the statement obtained from Brown, Smith "drew blood into his mouth and then spit on [him]." *Id.* at 145. Brown told Agent Stephan that he later placed his shirt in a paper bag and sealed it. Brown also stated that he "thought SCO Boysen and SCO Kuku had witnessed Inmate Smith spit in his face." *Id.* Stephan also interviewed both Boysen and Kuku. Although both Officers indicated that they did not see Smith spit on Brown, Boysen told Stephan that he "did see blood splatter on Sgt. Brown and it looked like someone had spit on him." *Id.* 147. A similar statement was obtained from Kuku, who indicated that he too "did see blood on the front of Sgt. Brown's shirt." *Id.*

Smith was also interviewed by Stephan during the course of his investigation. Smith told Stephan that "what happened next was his [Smith's] fault." *Id.* at 146. According to Smith, he

was "mad at the time" and "wasn't going to IP." Smith also told Agent Stephan that "if he was going down to IP, he was going down hard." *Id.* In the statement given to Stephan, Smith also admitted that he too "saw blood on Sgt. Brown's face and shirt." *Id.* He maintained, however, that "in the heat of the whole incident," he "didn't remember spitting on Sgt. Brown." *Id.* According to Smith, "blood was flying around when he was taken down and it could have landed on Sgt. Brown." Smith, however, told Stephan that "if he spit on Sgt. Brown, he was sorry." *Id.*

## DISCUSSION

### I.    Smith's Motions for Entry of Default Judgment

Smith moves this court for entry of default judgment based on defendants' failure to file a motion for summary judgment based on qualified immunity by the July 20, 2017 deadline. Dockets 114, 118, 139, 145. The Clerk denied entry of default against defendants. Docket 115.

Indeed, defendants failed to file a motion for summary judgment based on qualified immunity by July 20, 2017, but this does not entitle Smith to default judgment. First, Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Defendants filed a pleading—namely its answer—and that is sufficient to meet the requirements of Rule 55(a). Second, defendants timely filed a motion for summary judgment, just not one based on qualified immunity, before the October 16, 2017 motions deadline set out in the scheduling order. Docket 92. Thus, Smith's motions for entry of default judgment is denied.

## II.     Smith's Motions to Amend Complaint

Smith moves to amend his complaint. Dockets 124, 165. Defendants responded and requested that this court deny Smith's motion to amend. Docket 167. Smith replied by reiterating his new claims and stating he filed a new federal civil case. Docket 169.

The court previously granted Smith leave to amend his complaint. Docket 66. The court also denied Smith leave to amend on five previous occasions. Dockets 26, 53, 58, 68, 113. On May 11, 2016, the court denied Smith's motion to amend for failure to comply with the local rules and for filing it while the case was stayed pending resolution of his state court proceeding. Docket 26. On January 10, 2017, the court was unable to grant the motion to amend because of Smith's contradictory motions to amend. Docket 53. On January 24, 2017, the court again denied Smith's motion to amend for failure to follow the court's instructions. Docket 58. On March 8, 2017, the court found that Smith was no longer entitled to amend as a matter of course and the court found Smith's proposed amendments futile. Docket 68.

Through his most current motion to amend, Smith seeks to add defendants, some new and some previously dismissed, and to add a conspiracy claim. Docket 165. Because Smith's motion to amend was filed after the deadline for amending pleading as provided in the court's scheduling order (Docket 92), the amendment implicates both Rules 15 and 16 of the Federal Rules of Civil Procedure. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008). Additionally, Smith's motion to amend his amended complaint should be denied as a procedural matter for a failure to comply with Local Rule 15.1. Local Rule 15.1 provides that "any party moving to amend a pleading must attach a copy of the proposed amended pleading to its motion to amend with the proposed changes highlighted or underlined so that they may be easily identified." Despite Smith's

repeated failure to comply with this rule, the court will consider whether amendment of his pleadings would otherwise be appropriate.

## A. Legal Standard

A motion to amend a party's pleadings is ordinarily governed by Rule 15 of the Federal Rules of Civil Procedure. Under Rule 15, a party may amend a pleading with "the court's leave," and the Rule directs the court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). But "[i]f a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule" in accordance with Rule 16(b). *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008) (citing FED. R. CIV. P. 16(b)). There is not, however, an absolute right to amend pleadings. *Sherman*, 532 F.3d at 715 (citation omitted).

Rule 16(b) is designed to guide the "issuance and modification of pretrial scheduling orders and provides that '[e]xcept in categories of actions exempted by local rule, the district judge . . . must issue a scheduling order,' which 'must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.' " *Sherman*, 523 F.3d at 715 (quoting FED. R. CIV. P. 16(b)(1), 16(b)(3)(A)) (alterations in original). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). The "good cause" requirement of Rule 16(b) necessitates a stronger showing that the movant is entitled to relief than "the more liberal standard" of Rule 15(a). *Sherman*, 532 F.3d at 716 (citing *Popoalii*, 512 F.3d at 497). "Thus, a moving party must first make the requisite [good cause] showing. Even then the district court retains discretion as whether to grant the motion." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (citation omitted) (explaining that "[a]s a vehicle designed to streamline the flow of litigation through our crowded dockets, we do not take [scheduling] orders lightly, and will enforce them").

31

"What constitutes good cause sufficient to justify the modification of a scheduling order necessarily varies with the circumstances of each case." 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1522.2 (3d. ed.). In *Sherman*, the Eighth Circuit explained the contours of the "good cause" standard as follows:

> The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements. *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006), *see also* Fed. R. Civ. P. 16(b), advisory committee note (1983 Amendment) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. . . . Our cases reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order.

*Sherman*, 532 F.3d at 716-17 (alterations in original) (internal citations omitted).

### B. Diligence

The court must first consider Smith's diligence in deciding whether good cause exists to amend the court's scheduling order. *See id.* The deadline for amending pleadings under the court's scheduling order was Friday, June 2, 2017. Docket 92. Smith's motion to amend was filed more than four months later on October 31, 2017. *See* Docket 165.

In *Sherman*, the Eighth Circuit found the defendant failed to establish good cause to amend its answer to include an affirmative defense when: (1) the motion to amend was filed over seventeen months after the scheduling deadline for amending pleadings; (2) defendant admitted awareness of the defense eight months prior to moving for the amendment; (3) defendant did not apply the defense until the summary judgment stage; and (4) "no change in the law, no newly discovered facts, or any other circumstance made the [affirmative] defense more viable after the scheduling deadline for amending pleadings." *Sherman*, 532 F.3d at 717-18. Similarly, in *Barstad v. Murray County*, 420 F.3d 880, 883 (8th Cir. 2005), the court ruled the plaintiffs did not have

good cause to amend the complaint when they were almost two months past the deadline but had known about the claim they sought to add for twenty-one months.

In *Popoalii*, the plaintiff moved to amend her complaint almost six months after the court's deadline to do so passed. *Popoalii*, 512 F.3d at 495. Her original complaint alleged that the defendants were deliberately indifferent to her medical needs, and she sought leave to add a claim for negligence. *Id.* at 495-96. In defense of the amendment, the plaintiff argued that "she decided to add a negligence count only after extensive discovery[.]" *Id.* at 497. The Eighth Circuit, however, found her argument unpersuasive because the facts supporting her negligence claim should have been available to her even without discovery. *Id.* (explaining the overlap between pleading a claim for deliberate indifference and a claim for negligence).

In this case, Smith does not even attempt to assert good cause under Rule 16(b). Dockets 165 and 169. Smith seeks to add a conspiracy claim consisting of events unfolding in 2013. Dockets 165 and 169. This information was available to Smith well before the deadline to amend his complaint. Smith further attempts to add defendants this court previously dismissed without new allegations or argument. Dockets 165 and 169. Again, this information was available to Smith well before the deadline to amend his complaint. Smith has failed to show good cause for granting his motion to amend his complaint. Thus, Smith's motion to amend (Docket 165) is denied.

### III.    Smith's Motion to Supplement

Smith moves this court to supplement his complaint and other motions. Docket 168. Defendants do not respond. The Eighth Circuit has noted "supplemental pleadings, not amended pleadings, are intended to cover matters occurring after the original complaint is filed. Rule 15(d) gives the district court discretion to permit parties to serve supplemental pleadings." *United States ex rel Kinney v. Stoltz*, 327 F.3d 671, 674 n. 4 (8th Cir. 2003) (internal citation omitted).

The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed. Leave to file a supplemental complaint under Rule 15(d) rests with the court's discretion and should be freely granted if it will promote the just disposition of the case, not cause undue prejudice or delay, and not prejudice the rights of any parties. The court applies Rule 15(d) in a manner aimed at securing the just, speedy and inexpensive determination of every action-the standard applicable to motions to amend under FED.R.CIV.P. 15(d) is essentially the same standard that applies to FED.R.CIV.P. 15(a).

*Carl Zeiss Meditec, Inc. v. Xoft, Inc.*, 2011 WL 1326053 at *1 (D.Del. Apr.5, 2011) (punctuation altered, internal citations omitted). In exercising its discretion, the court should also consider whether "the proposed pleading is futile in that it adds nothing of substance to the original allegations or is not germane to the original cause of action." *Lewis v. Knutson*, 699 F.2d 230, 239 (5th Cir. 1983) (citations omitted). Smith's motion to supplement all filings in this case adds nothing of substance. Smith seeks to add a claim of conspiracy, which the court addressed above, and reargues pending motions. Thus, Smith's motion (Docket 168) is denied.

## IV. Smith's Motion to Reconsider Screening Order

Smith moves this court to reconsider its screening order (Docket 66). Docket 130. A district court's decision on a motion for reconsideration rests within its discretion. *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 (8th Cir. 1988). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* at 414. Smith claims no error of law, fact, or newly discovered evidence. *See* Docket 130. Rather, Smith again expresses his strong disagreement with Judge Schreier's order. Smith simply reiterates his previous conclusions and offers nothing that would allow his claims to survive screening. Judge Schreier's orders set forth what Smith would need to allege to survive screening. Docket 66. Yet, Smith does nothing to correct the insufficiencies outlined by Judge Schreier. Thus, Smith's motion to reconsider (Docket 130) is denied.

34

## V.     Smith's Motion to Admit Evidence

Smith filed a motion to admit several pieces of evidence under Federal Rules of Evidence 103, 901, and 902. Docket 131. The evidence consists of a disciplinary report, unplanned use of force checklist, a South Dakota Attorney General's Office Division of Criminal Investigation Investigative Report, a State of South Dakota Grand Jury Indictment, a DCI forensic laboratory report, and disciplinary hearing findings. Docket 131. The defendants did not respond.

A review of the record in this case shows that defendants also filed a copy of the disciplinary report and a complete copy of the unplanned use of force checklist. *See* Dockets 153-3, 153-6. Additionally, Smith has filed these documents with the court on more than one occasion. *See* Dockets 1-5, 171. With no expressed opposition from defendants, the documents are incorporated into the record of this case. Thus, Smith's motion to admit evidence (Docket 131) is granted insofar as the evidence is incorporated into the record of this case and the evidence would be considered by the court in the context of the defendant's motion for summary judgment.

## VI.    Smith's Motion for an Order to Show Cause, an Injunction, and a Restraining Order

Smith filed a motion for an order to show cause, an injunction, and a restraining order. Docket 140. Defendants did not respond. "A preliminary injunction is an extraordinary remedy." *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citation omitted); *see also Hughbanks v. Dooley*, 788 F. Supp. 2d 988, 992 (D.S.D. 2011) ("[I]n the prison setting, a request for a preliminary injunction 'must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration' ") (quoting *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)). "The burden

of proving that a preliminary injunction should be issued rests entirely with the movant." *Goff*, 60 F.3d at 520.

The four factors the court considers in determining whether to grant preliminary injunctive relief are: " '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.' " *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). Since *Dataphase*, the Eighth Circuit Court of Appeals has "observed that the 'likelihood of success on the merits is most significant.' " *Id.* (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)).

Smith contends that a restraining order/injunction is necessary because defendants continue to retaliate against Smith and put Smith in the SHU on August 7, 2017. First, it appears Smith was able to resolve his grievance through administrative remedies within the prison. Docket 140 at 2. Second, Smith makes no effort to show that he is likely to succeed on the merits. At this stage of the proceedings, plaintiff has not made an adequate showing that he is likely to succeed on the merits or that he will be irreparably harmed. Therefore, Smith's motion (Docket 140) is denied.

## VII.    Smith's Motion for Subpoena

Smith requests that the court subpoena certain witnesses. Docket 142. A subpoena's "function is to compel the attendance of witnesses and the production of documents so that the court may have access to all of the available information for the determination of controversies before it." 9A Charles Alan Wright et al., *Federal Practice and Procedure* § 2451 (3d ed.). In his motion, Smith explains these individuals have "documents that is either in their possesson [sic], or that was in their possisson [sic], either that they had made them up or had something to do with

the process of these documents being made up." Docket 142 at 2. The request for documents or information these people may have would be more appropriately address to defendant's counsel through discovery. There is no indication that any such request was ever made. Therefore, Smith's motion (Docket 142) is denied.

## VIII.   Smith's Motion to Appoint Counsel

Smith moves to appoint counsel. Docket 148. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant's civil case, the district court considers the complexity of the case, the ability of the indigent litigant to investigate the facts, the existence of conflicting testimony, and the indigent's ability to present his claim. *Id.* Smith appears able to adequately present his § 1983 claims at this time. The motion to appoint counsel is denied without prejudice to its renewal. If this case goes to trial, the court will consider appointing counsel since Smith would not be familiar with trial practices and procedures.

## IX.     Smith's Requested Writ of Mandamus

Smith petitions this court to issue a writ of mandamus and to reconsider all of Judge Schreier's orders. Docket 151. The court construes Smith's requested relief as a motion to reconsider. Smith states,

> I would ask this court now, to readress [sic] every [o]rder that Judge Karen E. Scherier [sic] made now, and reavaluate [sic] her Order#66 order then, this is the ruling that changed my intire [sic] case then. I ask this court to reconsider Doc.#26;53 order lifting stay, but denying all motions;58;68;77, granting the defendants time to file;82;113, granting the defendants motion for protective order.

Docket 151 at 3. A district court's decision on a motion for reconsideration rests within its discretion. *Hagerman*, 839 F.2d at 413. "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* at 414. Smith

claims no error of law, fact, or newly discovered evidence. *See* Docket 151. Thus, Smith's request (Docket 151) is denied.

## X. Smith's Motion Regarding Defendant's Captions

Smith moves this court to allow defendants more time to rewrite their headings in their summary judgment motion and related filings. Docket 166. Defendants did not respond. Smith fails to establish any legal basis for this court ordering that defendants alter their headings. Thus, Smith's motion (Docket 166) is denied.

## XI. Smith's Motion for Summary Judgment

On November 16, 2017, Smith filed a motion for summary judgment. Docket 170. Defendants responded and requested that the court deny Smith's motion for summary judgment for failure to comply with D.S.D. Civ. LR Rule 56.1(a). Docket 172. Smith then replied, "I only filed this Summary Judgment Motion for the Court without knowing it[.]" Docket 173. Smith continued on to requested that the court "set this case for [j]ury [t]rial now." Docket 173.

Rule 56.1(A) of the Local Rules of Practice for the District of South Dakota provides:

> All motions for summary judgment must be accompanied by a separate, short, and concise statement of material fact as to which the moving party contends there is no genuine issue to be tried. Each material fact must be presented in a separate numbered statement with an appropriate citation to the record in each case.

Smith failed not complied with Local Rule 56.1(A). Although pro se pleadings are to be construed liberally, pro se litigants are not excused from compliance with procedural and local rules. *See Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983). The court does not conclude that Plaintiff's pro se status excuses compliance with D.S.D. LR 56.1(A) in the case at hand. The failure to comply with a local rule requiring that a motion for summary judgment be accompanied by a concise statement of material facts which the movant contends are not genuinely in dispute is a sufficient basis on which to deny a motion for summary judgment. *Servin v. GATX Logistics. Inc.*,

187 F.R.D. 561 (N.D.Ill. 1999); *Griffin v. Bank of America*, 971 F.Supp. 492 (D.Kan. 1997). The court is denying Smith's motion for summary judgment (Docket 170) on this basis.

Smith's pleadings and reply suggest that Smith may have just been attempting to respond to defendants' motion for summary judgment. Yet, even as a response, Smith failed to comply with Local Rule 56.1(B). Smith does respond to each numbered paragraph in defendants' Statement of Material Fact with a separately numbered response. Smith does not make appropriate citations to the record. Instead, Smith simply notes that he disagrees with defendants.

## XII. Defendants' Motion for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation omitted).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 9A Charles Alan Wright et al., *Federal Practice and Procedure*,

§ 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48.

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## B. Official Capacity

Smith has sued each of the defendants in their official capacity. As the Supreme Court has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties . . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66. The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* Because

Smith has sued defendants in their official capacities, Smith has asserted a claim for money damages against the state of South Dakota. The state of South Dakota has not waived its sovereign immunity. Thus, to the extent Smith seeks to hold defendants liable in their official capacities for money damages, the court would find that defendants are protected by sovereign immunity and would be entitled to judgment on this issue as a matter of law.

### C. Brown, Boysen, Kuku - Excessive Force

Defendants move for summary judgment on Smith's excessive force claim. Under the Eighth Amendment, prisoners are protected "from the unnecessary and wanton infliction of pain by correctional officers[.]" *Treats v. Morgan*, 308 F.3d 868, 870 (8th Cir. 2002) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). This is true, "regardless of whether an inmate suffers serious injury as a result." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Defendants may "use force reasonably 'in a good-faith effort to maintain or restore discipline,' but force [may] not to be used 'maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7).

"In an Eighth Amendment excessive force case, 'the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Smith v. Conway Cty., Ark.*, 759 F.3d 853, 858 (8th Cir. 2014) (quoting *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013)). In deciding an Eighth Amendment claim, the court considers "whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury." *Treats*, 308 F.3d at 870 (citing *Hudson*, 503 U.S. at 7). Because "the use of force is sometimes required in prison settings," *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008), courts frequently uphold officers' ability to use physical force to restrain noncompliant inmates.

41

*See, e.g., Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir. 2006); *Jasper v. Thalacker*, 999 F.2d 353, 354 (8th Cir. 1993) (use of a stun gun to subdue a combative prisoner, even when four guards were present, was not excessive force).

Although Smith's account of the incident differs from defendants, the material facts are not disputed. First, Smith refused to be handcuffed and moved to the SHU after an altercation with his cellmate. *See* Dockets 153-3, 153-4, 153-5, 153-6, 153-76 at 10-12, 153-115 ¶ 8, 153-116 ¶¶ 7-12. The SDSP policy dictates that all inmates, after being involved in an altercation, are to be escorted and placed in the SHU pending an investigation of the incident. Docket 153-116, 153-115. Not only did Smith repeatedly refuse orders to cuff up, Smith grew angry and postured "as if he was ready to fight." Dockets 153-3, 153-6, 153-116 ¶ 12. Second, it was only after numerous attempts to temper Smith's resistance that Brown used pepper spray and ordered Boysen and Kuku to place Smith in the holding cell. Docket 153-3, 153-4, 153-5, 153-115, 153-116 ¶12. The use of force by Brown, Boysen, and Kuku was applied for the purpose of gaining control of a recalcitrant inmate.

Smith's own conduct made it necessary for prison officials to forcefully restrain him. As a matter of law, there is nothing inhumane or wanton about enforcing reasonable prison regulations. *Stenzel v. Ellis*, 916 F.2d 423, 428 (8th Cir. 1990). As was aptly stated by the Seventh Circuit:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009); *see also Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (pepper-spraying an inmate who disobeyed orders and engaged in aggressive acts

of defiance was not a case where "a complete absence of a penological purpose" raised "the reasonable inference that the officers acted maliciously in an effort to cause harm").

There is also no material question of fact as to whether the force was excessive when defendants pepper-sprayed and placed Smith in a holding cell. In his complaint, Smith claims that officers drove him down the tier approximately twenty-five feet breaking his broken nose and damaging his ankle in the process. Docket 1 at 25. But defendants demonstrated, through medical records and Smith's criminal trial testimony, that there is no genuine issue of material fact as to whether Smith suffered a broken nose and ankle instability as a result of defendants' use of force. Smith does not contradict that he previously attributed his broken nose to the altercation with his cellmate or that his ankle injury only surfaced 118 days after the use of force despite earlier medical evaluations. *See* Dockets 1 at 9, 154 ¶¶ 7-9, 70, 153-9, 153-76 at 6-8. This court does not find credible Smith's allegation that defendants were able to drive him twenty-five feet down the hall. Nor does Smith raise a material issue of fact following defendants' explanation of how Smith's claim both conflicts with his own allegations and the prison layout.

The Eighth Circuit has previously held that the use of pepper spray after an inmate has disobeyed a direct order from an officer was not malicious or sadistic, but was a good-faith effort to maintain order or restore discipline. *See, e.g. Jones v. Shields*, 207 F.3d 491 (8th Cir. 2000). In that case, a court determined that a limited application of pepper spray to control a recalcitrant prisoner was a tempered response as compared to other forms of force available. *Id.* at 496. Here, Smith repeatedly engaged in noncompliant behavior. After a final warning, officers exerted the force necessary to restrain Smith for his own safety and the safety of others. The facts currently demonstrate no sadistic or malicious action on the part of these three officer. Defendants' motion for summary judgment would be granted on the basis of the record as it now stands.

### D. Deliberate Indifference Medical Care

Defendants move for summary judgment on Smith's deliberate indifference claims. In moving for summary judgment, defendants argue that they did not violate Smith's Eighth Amendment rights. "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169–173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05.

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784. The Eighth Circuit has determined that the following circumstances exhibit a serious medical condition: a pregnant inmate who is bleeding and passing blood clots, *see Pool v. Sebastian Cnty., Ark.*, 418 F.3d 934, 945 (8th Cir. 2005); an inmate who is complaining of extreme tooth pain and presenting with swollen, bleeding gums, *see Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); and a diabetic inmate who is experiencing excessive urination, diarrhea, sweating, weight loss, and dehydration, *see Roberson v. Bradshaw*, 198 F.3d 645, 647–48 (8th Cir. 1999).

To be liable for deliberately disregarding a serious medical need, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, " 'the failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.' " *Coleman*, 114 F.3d at 785 (citing *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) ("The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."). "The plaintiff-inmate must clear a substantial evidentiary threshold to show the [defendants] deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Greene Cnty. Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (citation omitted). To determine whether defendants are entitled to summary judgment, the court would assess the conduct of each defendant.

### 1. Lonna Vink

"Negligent misdiagnosis does not create a cognizable claim under § 1983." *McRaven v. Sanders*, 577 F.3d 974, 982 (8th Cir. 2009). In *McRaven*, the court found that a prison nurse was not liable for deliberate indifference when "at worst she misdiagnosed appellant." *Id.* at 983. *See also Foster v. Cerro Gordo County*, 2016 WL 355082, at *7 (N.D. Iowa) ("[W]hile plaintiff's

treatment involved a misdiagnosis, a misdiagnosis does not rise to the level of deliberate indifference.").

Although Smith informed the court that he disagrees with defendant's statement of undisputed material fact, he currently fails to demonstrate a dispute of material fact involving Vink. Docket 170 at 7. Vink, at most, appears to have participated in the initial misdiagnosis of Smith's nose. Thus, Vink's motion for summary judgment would be granted based on the current record.

### 1. Ditmenson

There remains a genuine issue of material fact regarding whether or not Ditmenson denied Smith's sick call requests. Dockets 1 at 8, 159 ¶ 6, 170 at 9-10. Viewing the evidence in the light most favorable to Smith, Ditmenson ignored Smith's sick calls. The court's inquiry then focuses on whether there remains a genuine issue of material fact as to whether Smith suffered an objectively serious medical need and whether that need was known by Ditmenson. *Dulany*, 132 F.3d at 1239. This court previously held in its screening order that, "Smith's injuries were substantial . . . . Further, the risk was clear to Ditmenson. Smith was visibly injured, he was bleeding, and he requested medical treatment from Ditmenson, telling him about his injuries." Docket 66 at 18. Although medical records now color the extent of Smith's injuries differently, Smith undeniably displayed a cut across his nose as a result of an assault by his cellmate. Defendants argue a bloody nose or minor scrapes and bruises do not rise to the level of a serious medical need. But at this stage, before discovery has been completed, the court would deny defendant's motion for summary judgment.

## 2. Dr. Carpenter

Dr. Carpenter moves for summary judgment on the three claims of deliberate indifference against her and the claims include Smith's nasal injury, ankle injury, and Seroquel. Even construing the facts, and inferences from those facts, in a light most favorable to Smith, his three claims would fail as the record currently exists.

**Nasal Injury**

Regarding his nasal injury, Smith was given constitutionally adequate healthcare for his injuries. Dr. Carpenter found no need for surgical intervention, because Smith's deviated septum was "a chronic condition-not emergent." Docket 155 ¶¶ 80-81. To survive summary judgment, Smith "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly*, 205 F.3d at 1096, quoting *Estate of Rosenburg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995); *see also Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006). Decisions about whether a patient needs surgery or any other particular type of treatment are medical judgments made by [medical providers] and cannot constitute a basis for deliberate indifference, because there is no showing that the treatment provided was so blatantly inappropriate that no minimally competent professional would have so responded under the circumstances." *Carrasco-Salazar v. Fearday*, 2015 WL 468771, *5 (W.D.Wis. Feb. 4, 2015) (citing *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013)).

In *Almashleh v. United States*, 2007 WL 2406965, at *6 (W.D. Pa Aug. 21, 2017), the court found that "plaintiff's primary complaint is that the individual defendants failed to provide for the surgical repair of [his] fractured nose." There, the inmate was similarly diagnosed with a deviated septum and said to have a history of trouble breathing through is right nostril. He was prescribed an anti-inflammatory steroid nasal spray to treat his nasal congestion. *Id.* at *2. It was decided by

the prison Utilization Review Committee that a surgical repair of the inmate's nose was not medically necessary. *Id.* at *3. In recommending that defendants' Motion for Summary Judgment be granted, the *Almashleh* court found that a review of plaintiff's medical records revealed that "surgical intervention was appropriately considered and found to be medically unnecessary." *Id.* at *6. The court held, "that defendants gave due consideration to the pros and cons of performing nasal surgery on plaintiff dispels plaintiff's claim that they were deliberately indifferent to his perceived need for surgery to correct his fractured nose." *Id.* The court further held that "although plaintiff disagrees with this course of treatment, a prisoner's disagreement with a course of treatment does not sustain a cognizable constitutional claim." *Id.*

Aside from Smith's allegations, there is currently no evidence in the record that Dr. Carpenter deliberately disregarded Smith's serious medical needs. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." *McCourt v. Rios*, 2010 WL 3269905, at *12 (D. Minn. July 16, 2010) (citing *Dulaney v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)). Midwest ENT saw Smith on three occasions and Health Services saw Smith on numerous occasions since the injury. Dockets 1 at 11, 155 ¶ 76, 153-44, 154 ¶ 78. His conditioned was monitored and no deterioration was found. Docket 154 ¶ 78, 153-47. Dr. Carpenter found no current need for surgical intervention. Docket 154 ¶ 80. Currently, Dr. Carpenter's motion for summary judgment would be granted.

**Ankle Injury**

Regarding Smith's ankle injury, Smith presently fails to demonstrate that Dr. Carpenter was indifferent to Smith's ankle injury in delaying surgery. "[W]here pain or discomfort is the sole effect of a delay in treatment, an inmate fails to state a deliberate indifference claim." *Leggins v.*

*Eggert*, 2014 WL 1285786, at *8 (D.S.D. March 27, 2014) (citing *Reed v. Weber*, 2010 WL 3363402, at *4 (D.S.D. Aug. 23, 2010)). In a similar case, the court held,

> Although Petitioner believes that those doctors who requested surgery are correct and those doctors who denied the surgery are incorrect, this belief is not enough to show that the lack of surgery amounts to deliberate indifference. To the contrary, the dispute indicates that the denial of surgery does not rise to the level of an Eighth Amendment claim for inadequate medical care."

*Rodriguez v. Lappin*, 2009 WL 2969510, at *6 (E.D.Ky. Sept. 11, 2009) (citing *Greer v. Daley*, 2001 WL 34377922 (W.D.Wis. Dec. 27, 2001)).

Dr. Carpenter denied the first ankle surgery request, because Dr. Watts informed Dr. Carpenter that "not immediately fixing the ankle instability via surgery would not change the long term outcome" for Smith. Docket 155 ¶ 22. Health Services continued to provide Smith medical treatment in connection with is left ankle. They provided Smith a left ankle sleeve and issued a lace up ankle brace. Dockets 155 ¶ 24, 153-21. When Smith's condition further deteriorated, Health Services resubmitted the request for surgery. Docket 155 ¶ 41. Smith then underwent two surgeries to correct ankle instability caused by cartilage loss likely related to degenerative arthritis. Docket 154 ¶ 20; 153-16. Smith eventually wrote to Dr. Watts and indicated that he was happy with the results. Docket 153-90. Presently, Dr. Carpenter's motion for summary judgment would be granted.

**Seroquel**

Smith's allegation that Dr. Carpenter was deliberately indifferent to Smith's bipolar disorder in denying him Seroquel currently fails. First, defendants demonstrated that Dr. Carpenter was not involved in the decision to discontinue Seroquel. Second, Smith is not entitled to his prescription drug of choice.

In order to state a claim under § 1983, Smith must establish that Dr. Carpenter was "personally involved in or had direct responsibility for the incidents that injured him." *Reynolds v. Dormire*, 636 F.3d 976, 980 (8th Cir. 2011). Defendants clearly demonstrate through exhibits that it was not Dr. Carpenter who denied Seroquel. Docket 164-9 at 7. Dr. Clay Pavlis declined the request to continue Seroquel and the stated reason was "Need documented trials of Formulary alternatives for continued use." *Id.*

The record shows that Mental Health staff offered Smith alternative mood stabilizers, but Smith initially declined. Docket 164-9 at 12. Smith is not entitled to his choice of medication. "The Eighth Amendment does not give an inmate an unfettered right to the medication of his choice." *Sargent v. Coakley*, 2014 WL 201733, at *3 (N.D. Ohio Jan. 16, 2014) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). Thus, the court would grant Dr. Carpenter's motion for summary judgment based on the current record.

### 3. Bowers & Steineke

Smith's Eighth Amendment claim against Bowers and Steineke involves a delay in the issuance of work boots following Smith's ankle surgery. Smith's serious medical condition is demonstrated by the need for two ankle surgeries on February 4, 2015 and October 19, 2015. Docket 154 ¶¶ 43-53, 153-55, 153-84. It is, however, undisputed that Smith received work boots. Bowers and Steineke contend Smith received boots on July 13, 2015. Dockets 156 ¶19, 153-78, 153-83. Smith contends he received the boots on December 29, 2015. Docket 170 at 12. When seen by Health Services on September 15, 2015, Smith complained that he "has not received his work boots as recommended by CORE Orthopedics. Docket 156 ¶ 19, 153-83. It was at this time that Bowers contacted Steineke, "who verified that patient received a new pair of shoes and work boots on 7/13/2015." Dockets 156 ¶ 19, 153-73. Based on the current record, the court would not

find that the delay in receiving work boots rises to the level of a constitutional violation and would grant defendants' motion for summary judgment.

### E.  First Amendment Legal Mail – Steineke

Defendants argue that Smith failed to exhaust his administrative remedies before filing his complaint. Docket 153 at 48-49. "An inmate must exhaust all available administrative remedies before bringing a § 1983 suit." *Porter v. Sturm*, 781 F.3d 448, 450 (8th Cir. 2015) (citing 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014)). An inmate must pursue the " 'grievance process to its final stage' to 'an adverse decision on the merits.' " *Id.* (quoting *Burns*, 752 F.3d at 1141. There is "no question that exhaustion is mandatory under the PLRA [Prison Litigation Reform Act]." *Jones*, 549 U.S. at 211. Unexhausted claims, therefore, cannot be brought in federal court. *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005). The PLRA "requires immediate dismissal of all unexhausted claims." *Whiting v. Eagle Bear*, 2016 WL 297435, at *4 (D.S.D. Jan. 22, 2016).

"Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter*, 781 F.3d at 450 (citing *Jones*, 549 U.S. at 211–12). Through the affidavit of Melissa Maturan, defendants contend that Smith's institutional file does not contain copies of any Informal Resolution Requests or Requests for Administrative Remedies submitted by Smith in connection with Smiths allegations that Steineke interfered with Smith's mail. Docket 162 ¶ 4. Furthermore, Smith raises no issue of material fact regarding his failure to file any Informal Resolution Requests or Requests for Administrative Remedies. Thus, the court would grant Steineke's motion for summary judgment.

## F. Retaliation

To establish a retaliation claim, Smith must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Smith alleges that he was engaged in a protected activity by bringing a case in court. The adverse action he alleges is denial of access to Bidne and the taking of his legal papers. Smith also alleges this was done to stop him from pursuing his legal claims.

As to missing legal papers, defendants argue that Smith failed to exhaust his administrative remedies before filing his complaint. Docket 153 at 53. Through the affidavit of Melissa Maturan, defendants contend that Smith's institutional file does not contain copies of any Informal Resolution Requests or Requests for Administrative Remedies submitted by Smith in connection to his missing legal papers. Docket 162 ¶ 7. Additionally, Smith raises no issue of material fact regarding his failure to file any Informal Resolution Requests or Requests for Administrative Remedies. Thus, the claim would not go forward.

As to Smith's denial of access to Bidne, defendants allege that Smith frequently visited Bidne's office. Docket 154 ¶ 5. During the time period in question, Smith visited Bidne's office approximately three times a week. *Id.* at ¶ 6. When contacted in connection with the allegations raised by Smith, Bidne indicated that "in the last three months alone, Smith had been to [his] office on at least twenty-seven different occasions." *Id.* ¶ 5; Docket 153-119. Bidne even states, "Whenever he submits a kite, he is called over." Docket 153-119. Smith has not yet identified who denied him access to Bidne's office, but Smith has not yet had an opportunity to conduct discovery.

The record presently, however, fails to demonstrate any denial of access and summary judgment would be granted.

### G. Due Process - David Stephan

Defendant Stephan moves for summary judgment. In order to state a constitutional violation based on an inadequate investigation, Smith must show that David Stephan's "failure to investigate was intentional or reckless, thereby shocking the conscience." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012). Thus, negligence and gross negligence are inadequate to sustain a constitutional violation. *Amrine v. Brooks*, 522 F.3d 823, 834 (8th Cir. 2008). The Eighth Circuit explained that the following situations indicate a reckless or intentional failure to investigate that shocks the conscious: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [or] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Windslow*, 696 F.3d at 732 (internal quotation marks omitted) (quoting *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009)). "Mere negligent failure to investigate, such as failing to follow up on additional leads, does not violate due process." *Id.* (citing *Amrine*, 522 F.3d at 833-34).

Smith's allegations center on the "synopsis" Stephan created and an unidentified source that allegedly pressured Stephan to write the synopsis in such a way as to prosecute Smith in retaliation for filing a federal lawsuit. Docket 170 at 15-16. Smith contends this is clear because there are inconsistencies between the DCI synopsis and DOC records. In particular, Smith alleges that the synopsis contains lies by Brown. Docket 170 at 13-15.

"[Although] a reckless investigation claim may be supported by proof that investigators exerted systematic pressure to implicate the defendant in the face of contrary evidence, . . . a

manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant." *Id.* (internal quotation marks and citations omitted). However, the Eighth Circuit cautions:

> Defendants may not be held liable merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime. In investigating a crime, it is unlikely that every witness's account will align perfectly with the testimony of every other witness.

*Id.* at 734.

There are inconsistencies in the record in this case. But "[a] negligent failure to investigate inconsistencies . . . does not violate due process." *Folkerts v. City of Waverly Iowa*, 707 F.3d 975, 981 (8th Cir. 2013). Additionally, defendants refute a claim of fabrication by showing that Smith's own statements during the course of Stephan investigation support Stephan's synopsis. Smith told Stephan that "what happened next was his [Smith's] fault." Docket 1-5 at 25. According to Smith, he was "mad at the time" and "wasn't going to IP." Smith also told Agent Stephan that "if he was going down to IP, he was going down hard." *Id.* In the statement given to Stephan, Smith also admitted that he too "saw blood on Sgt. Brown's face and shirt." *Id.* He maintained, however, that "in the heat of the whole incident," he "didn't remember spitting on Sgt. Brown." *Id.* According to Smith, "blood was flying around when he was taken down and it could have landed on Sgt. Brown." Smith, however, told Stephan that "if he spit on Sgt. Brown, he was sorry." *Id.*

Smith has yet to demonstrate a genuine issue of material fact as to whether Stephan's investigation was intentional or reckless in light of his own comments to Stephan. The failure to investigate these inconsistencies is insufficient to be a violation of due process. Thus, the court would grant Stephan's motion for summary judgment.

Accordingly, it is ORDERED

1.  Defendant's motion for summary judgment (Docket 152) will be held in abeyance until discovery is completed.

2.  The stay of discovery (Docket 113) on Smith's case is lifted. The court by this order does provide for sixty (60) day of discovery from the date of this order.

3.  Smith's motions for default judgment (Docket 118, 139, 145) are denied.

4.  Smith's motion for leave to file depositions (Docket 123) is denied as moot.

5.  Smith's motion to amend (Docket 124) is denied as moot.

6.  Smith's motion to amend (Docket 165) is denied.

7.  Smith's motion to supplement (Docket 168) is denied.

8.  Smith's motion to reconsider screening order (Docket 130) is denied.

9.  Smith's motion to admit evidence (Docket 131) is granted insofar as the evidence is incorporated into the record of this case and the evidence would be considered by the court in the context of the defendants' motion for summary judgment.

10. Smith's motion for injunction and restraining order (Docket 140) is denied.

11. Smith's motions to schedule a jury trial (Dockets 141, 174, 178, 181) are denied as moot.

12. Smith's motion for subpoena's (Docket 142) is denied.

13. Smith's motion to appoint counsel (Docket 148) is denied without prejudice.

14. Smith's petition for a writ of mandamus (Docket 151) is denied.

15. Smith's motion regarding defendants' headings (Docket 166) is denied.

16. Smith's motion for summary judgment (Docket 170) is denied.

17.     Smith's motion to now show cause to make these changes (Docket 175) is denied

as moot.

18.     Smith's objection motion (Docket 176) is denied as moot.

Dated this 22nd day of March, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY:_____
DEPUTY